STATE OF CONNECTICUT *v.* VICTOR TORRES
(AC 14279)

Lavery, Landau and Schaller, Js.

Submitted on briefs October 1—officially released November 18, 1997

*Susan M. Hankins*, assistant public defender, filed a brief for the appellant (defendant).

*John A. Connelly*, state's attorney, and *Harry Weller* and *John Davenport*, assistant state's attorneys, filed a brief for the appellee (state).

LANDAU, J. This matter is currently before us on remand from our Supreme Court. *State* v. *Torres*, 242 Conn. 485, 698 A.2d 898 (1997). The defendant appealed to this court from a judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[1] and 53a-54a (a).[2] A divided panel of this court reversed the trial court's judgment on the ground that the evidence was insufficient to support the jury's guilty verdict. *State* v. *Torres*, 41 Conn. App. 495, 676 A.2d 871 (1996). Our

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

Supreme Court granted the state's petition for certification, limited to the issue of whether the Appellate Court properly determined that the defendant's conviction was not supported by the evidence. *State* v. *Torres*, 239 Conn. 902, 682 A.2d 1012 (1996). Our Supreme Court reversed the judgment of the Appellate Court, concluding that the evidence was sufficient to sustain the jury's verdict, and remanded the case for our consideration of the defendant's remaining claims. The defendant claims that the trial court improperly admitted evidence of his gang membership and leadership positions because (1) the prejudicial effect of that evidence outweighed its probative value, and (2) the admission of the evidence deprived him of his constitutionally protected rights under the Connecticut and United States constitutions to due process, a fair trial and freedom of association.[3]

Our prior opinion describes the facts that the jury reasonably could have found. "The defendant was a 'regional commander' of a street gang known as the 'Latin Kings.' For several weeks, the defendant's gang was involved in an ongoing dispute with a rival gang known as 'Los Solidos.' In the afternoon hours of Sep-

---

[3] The defendant failed, however, to analyze his claim that his rights to due process and a fair trial were violated. Because he failed to identify or develop this claim, we decline to review it. See *State* v. *Walton*, 227 Conn. 32, 40 n.7, 630 A.2d 990 (1993); *State* v. *Sherman*, 38 Conn. App. 371, 384 n.5, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

In addition, the defendant claims that the trial court improperly failed to "limit the jury's consideration of the defendant's membership in the Latin Kings to any proper or probative purpose." The defendant failed, however, to preserve this claim at trial. Further, the defendant failed to furnish an adequate record for review. Practice Book § 4064C (d) (1) requires the party claiming error to "include in the brief of that party or the appendix thereto a verbatim statement of the relevant portions of the charge as requested and as given by the court and any relevant exceptions to the charge as given . . . ." See *State* v. *Krzywicki*, 39 Conn. App. 832, 838, 668 A.2d 387 (1995) (defendant failed to meet burden of providing adequate record for review by failing to include jury charge in his brief or appendix). Therefore, we decline to review this claim.

tember 26, 1993, the Latin Kings conducted an emergency meeting at Morales' Cafe [in Waterbury] to discuss a recent incident in which a member of their gang was shot at by a member of the rival gang. During the meeting, Jose Martinez, a member of the gang and a witness for the state, served as a lookout. Although Martinez had attended nine prior gang meetings in which the defendant had been present, he did not attend the emergency meeting, nor did he know whether the defendant was there. At the meeting, the gang devised a plan to retaliate for the shooting incident by killing a member of Los Solidos.

"After the meeting, Jose Velez, another gang member, instructed Martinez to keep watch for rival gang members from the roof of a four-story building located on East Clay Street. When Martinez arrived, four other gang members, including Velez, were already there. The group possessed an assortment of firearms including an M-16 rifle with a scope, a shotgun and several handguns. Velez had a portable CB radio that he used to maintain contact with other gang members, some of whom had remained at Morales' Cafe, which was referred to by the gang as 'sector one.' Other gang members were stationed in different locations throughout the area.

"At approximately midnight, the victim, Ana Plaza, was returning to her home at 79 East Clay Street, which is located across the street from the building where the group stood lookout on the roof. Plaza was accompanied by her son, Obdulio, her daughter, Melissa, and her infant granddaughter. As Plaza and her family prepared to enter Plaza's house, Velez and the others observed their actions from the rooftop. Velez had a brief conversation over the portable radio with an unknown individual about the activity at the Plaza residence. Immediately following that conversation, Velez instructed his people to fire at the Plaza family. At least

three gang members immediately opened fire discharging several rounds of ammunition for a duration of approximately twenty seconds.

"As a result of the gunfire, Ana Plaza was struck by a bullet in her hip and Melissa was struck by a bullet in her arm. As both women began screaming, Obdulio ran into the house and phoned the police and an ambulance. Meanwhile, the shooters fled from the roof of the building into a vacant apartment, stuffed their weapons into a duffel bag and ran from the area.

"Approximately ten days later, the police arrested the defendant and several other members of the Latin Kings. In an oral statement to Detectives Robert Henderson and Mark Deal of the Waterbury police department, the defendant admitted that he was a member of the Latin Kings and that he held the rank of regional commander at the time of the shooting. Although the defendant denied any personal involvement in the shooting, he informed the police that several members of a gang called the 'Nietas,' who were allied with his gang, were responsible for the shooting. The defendant stated that one of the shooters was called 'Cano,' and that a Latin King called 'Rambo' had helped with the disposal of the weapons used in the shooting." *State* v. *Torres*, supra, 41 Conn. App. 496–97.

The Supreme Court decision sets forth further facts that the jury reasonably could have found. "As a result of his investigation, Henderson learned that members of the Latin Kings had occupied various positions throughout Waterbury's south end on the evening of the shooting in order to implement the gang's plan to kill a Los Solidos gang member. Communication among the various locations was maintained through a CB channel on walkie-talkies, some of which Henderson subsequently retrieved. According to Martinez, [the state's key witness], the four other members of the Latin

Kings assigned to the rooftop of the building on East Clay Street with Martinez were heavily armed with shotguns, handguns and automatic weapons. Martinez further testified that, while acting as a rooftop lookout, he had heard the defendant's voice, among others, broadcast over Velez' walkie-talkie. At approximately midnight, Velez, immediately after speaking with an unidentified person over his walkie-talkie, gave the order to fire at the victims.

"Martinez also testified that the defendant was located at 'sector one' at the time Martinez heard his voice over Velez' walkie-talkie, and that 'sector one' was Morales' Cafe in Waterbury, one of the locations where members of the Latin Kings had been stationed in connection with the implementation of the plan. Martinez further indicated that, after the emergency meeting at which the illegal scheme was approved, members of the Latin Kings who had attended that meeting reviewed the plan with those gang members who, like Martinez, already had taken their positions and, consequently, were not present at the meeting.

"In his interview with Henderson after the shooting, the defendant acknowledged that he was the regional commander of the Waterbury Latin Kings, and that he previously had served as the gang's president and philosopher. On the basis of his conversation with the defendant, Henderson concluded that, although he was reluctant to implicate himself in the conspiracy, the defendant had demonstrated 'a lot of knowledge' regarding the shooting and had revealed information concerning the crime that was not available to the general public at the time." *State* v. *Torres*, supra, 242 Conn. 492–93.

On the prosecutor's direct examination of Martinez, the defendant twice objected to questions regarding the defendant's membership in the Latin Kings, and the trial

judge sustained both objections for lack of relevance. The prosecution then made an offer of proof after the jury was excused establishing, to the trial court's satisfaction, the relevance of the inquiry.[4] On direct examination, Martinez testified that the defendant was the "original commander" of the Latin Kings and that Martinez heard the defendant's voice on the walkie-talkie before the shootings occurred. The next witness, Henderson, also testified that the defendant was the regional commander of the Latin Kings.

The defendant claims that the trial court's admission of evidence relating to his gang membership and leadership positions violated the rules of evidence and the Connecticut and United States constitutions. The defendant first argues that the prejudicial effect of that evidence outweighed its probative value. The defendant next claims that the trial court's improper admission of the evidence violated his federal and state constitutional rights to freedom of association. We address these claims in turn.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . A party is not required to offer such proof of a fact that it excludes all other hypotheses; it is sufficient if the evidence tends to make the existence or nonexistence of any other fact more probable or less probable than it would be

---

[4] In the offer of proof, Martinez testified that the defendant was the regional commander of the Waterbury Latin Kings who sometimes attended meetings of the gang. Martinez further stated that while he was on the roof prior to the shooting, he heard the defendant's voice over a walkie-talkie used by the shooters on the roof. Martinez testified that he knew that the defendant was at Morales' Cafe at the time Martinez heard the defendant's voice, because "they were talking by codes and Morales' Cafe was sector one."

without such evidence. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Cosby*, 44 Conn. App. 26, 31–32, 687 A.2d 895 (1996), cert. denied, 240 Conn. 910, 689 A.2d 474 (1997).

"Probative evidence, although in some respects prejudicial, is admissible if the trial court, in the exercise of its sound discretion, determines that its probative value, for one or more of the purposes for which it is admissible, outweighs its prejudicial impact on the accused. . . . The trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. . . . We will reverse the trial court only where it has been demonstrated to this court that the trial court abused its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Darden*, 39 Conn. App. 645, 652, 666 A.2d 831 (1995), rev'd on other grounds, 239 Conn. 467, 687 A.2d 132 (1996). Further, a reviewing court "will indulge every reasonable presumption in favor of the trial court's ruling." *State* v. *Wideman*, 36 Conn. App. 190, 197, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995).

Evidence of the defendant's membership and leadership position in the Latin Kings was relevant to the criminal charge of conspiracy to commit murder. The evidence is specifically relevant to establish that the defendant's presence at Morales' Cafe, as well as his speaking on the walkie-talkie, was conduct in furtherance of the Latin King's objective to harm a member of a rival gang. See *State* v. *Mozell*, 40 Conn. App. 47, 51, 668 A.2d 1340, cert. denied, 236 Conn. 910, 671 A.2d 824 (1996) (gang membership relevant to establish that defendant conspired to kill rival drug dealer to protect

gang's territory); *United States* v. *Hartsfield*, 976 F.2d 1349, 1352 (10th Cir. 1992), cert. denied, 507 U.S. 943, 113 S. Ct. 1344, 122 L. Ed. 2d 727 (1993) (gang membership relevant to relationship with coconspirator and existence of conspiracy). The defendant's leadership position in the gang tended to make his participation in the gang's plan to kill members of a rival gang more probable than not.

In addition, the defendant's gang membership and leadership position were highly probative with respect to the charge of conspiracy to commit murder, and the prejudicial impact of such evidence did not outweigh the probative value. It is undisputed that to prove the existence of a conspiracy it is essential to show an association among the individuals involved. When a gang formulates a plan to kill a member of a rival gang, evidence connecting a defendant to that gang becomes highly probative to show that an agreement existed among the defendant and the members of the gang. Only after the prosecution established, in an offer of proof, a sufficient link between the evidence and the charge did the trial court allow an inquiry into the defendant's gang affiliation.[5] The evidence provided the jury with a reasonable basis for finding that the defendant intended to participate with his fellow gang members

---

[5] After sustaining two objections to the admission of the evidence, the following colloquy took place:

"The Court: There is no tie-in yet. He's neither established that he's at the meeting or anywhere else. Just establishing out of the clear blue that he's a Latin King, without any relevance is—

"[Deputy Assistant State's Attorney]: Well, Your Honor, I think clearly there's relevance. I mean, the Latin Kings are on the roof; they're watching while there's a meeting of the Latin Kings. The tie-in is that everyone involved in the case that he's testified to is a member of the Latin Kings. I'm asking if the defendant is a member of the Latin Kings.

"The Court: But the defendant hasn't been tied-in in any other fashion. Just being a member of the Latin Kings . . . [y]ou could in fact ask, 'Could you name for me all the members of the Latin Kings.' It just doesn't matter at this point other than there would be prejudice attached without any relevance."

in the plan to kill a rival gang member and that the defendant's presence at Morales' Cafe, or "sector one," was for the purpose of carrying out that plan. Indulging every reasonable presumption in favor of the trial court's ruling, we cannot say that the trial court abused its discretion by finding that the challenged evidence was relevant and that the prejudicial impact did not outweigh its probative value.

The defendant next claims that the trial court's improper admission of the evidence regarding his gang membership and leadership positions violated his federal and state constitutional rights to freedom of association.[6] The defendant specifically argues that his conviction was based on "guilt by association." The defendant failed to preserve this claim at trial, and, therefore, we will review the claim only if he shows that his claim meets the four requirements of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[7]

"[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs." *Dawson* v. *Delaware*, 503 U.S. 159, 163–64, 112

---

[6] The United States constitution provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble . . . ." U.S. Const., amend. I. The Connecticut constitution provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." Conn. Const., art. I, § 14.

The defendant claims that the Connecticut constitution provides greater protection than does the United States constitution. Although the Connecticut constitution sometimes provides greater protection than the federal constitution, we are unpersuaded by the defendant's analysis that the Connecticut constitution provides greater protection under the facts of this case.

[7] The four requirements are: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

S. Ct. 1093, 117 L. Ed. 2d 309 (1992). "[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." Id., 165; see also *United States* v. *Abel*, 469 U.S. 45, 49, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984) (evidence of respondent's membership in prison gang sufficiently probative and did not violate first amendment).

In the present case, the defendant's right to assemble *peaceably* with other gang members was not hindered. Further, the defendant's membership was not the basis for conviction; rather, the evidence merely tended to make his participation in the conspiracy to murder a rival gang member more probable. We conclude that the defendant has failed to demonstrate that the alleged constitutional violation clearly existed and clearly deprived him of a fair trial. See footnote 7. Therefore, the defendant's claim does not meet the third prong of *Golding* and, as a result, his constitutional claim must fail. See *State* v. *Taylor*, 239 Conn. 481, 502–503, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997) (*Golding* review denied because admission of evidence of gang involvement not constitutional violation depriving defendant of fair trial).

The judgment is affirmed.

In this opinion the other judges concurred.