******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* JERMAINE HARRIS
## (AC 42888)

Lavine, Alvord and Harper, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of murder, robbery in the first degree, and carrying a pistol without a permit, the defendant appealed. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly admitted uncharged misconduct evidence regarding two robberies and three shootings: the defendant failed to preserve his claim that the trial court improperly admitted evidence of uncharged misconduct, the defendant's objections lacked specificity with regard to the two robberies and the record did not reveal any objections to the admission of evidence regarding the shootings; moreover, the defendant was not entitled to reversal of his conviction under the plain error doctrine on his unpreserved claim that the trial court improperly admitted evidence of three uncharged shootings as it was clear from the record that the court balanced the probative value of the evidence against its prejudicial effect, and its determination that the evidence was more probative than prejudicial was legally correct; furthermore, even assuming, arguendo, that the trial court abused its discretion in admitting the evidence of the uncharged shootings, the defendant could not prove that the abuse of discretion was harmful in light of the trial court's ameliorative steps, which included limiting instructions to the jury regarding its use of uncharged misconduct evidence.

2. The defendant could not prevail on his claim that prosecutorial impropriety deprived him of his due process right to a fair trial; the prosecutor's comments about the defendant's gang affiliation and her misstatement about the location where the defendant confessed to an individual about the murder did not constitute prosecutorial impropriety and, although, the prosecutor's use of the defendant's nickname beyond the purpose of clarifying the responses of the witnesses was arguably improper, the defendant was not deprived of a fair trial by the prosecutor's use of his nickname, given the strength of the state's case, the fact that the prosecutor's use of the nickname was infrequent, and the defendant's failure to object to its use during trial.

3. The defendant could not prevail on his claim that his right to due process was violated because the state withheld materially favorable evidence; evidence of the state's arrangement to provide a witness with lodging and a stipend for food was immaterial and there was not a reasonable probability that the jury would have reached a different verdict had it considered the undisclosed impeachment evidence because the impeachment value of the evidence was low and the state's case did not rest on the testimony of that witness but, rather, there was ample evidence to support the defendant's conviction, including video surveillance that captured the shooting and testimony that the defendant twice confessed to shooting the victim.

Argued February 10—officially released June 30, 2020

*Procedural History*

Information charging the defendant with the crimes of murder, felony murder, robbery in the first degree, and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the defendant was tried to the jury before *Blue, J.*; verdict of guilty; thereafter, the court, *Blue, J.*, vacated the defendant's conviction of felony murder and sentenced the defendant on the remaining counts, and the defendant appealed. *Affirmed.*

*Vishal K. Garg*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Stacey M. Miranda*, senior assistant state's attorney, and *Karen A. Roberg*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Jermaine Harris, appeals from the judgment of conviction, rendered after a jury trial, of murder, robbery in the first degree, and carrying a pistol without a permit.[1] On appeal, the defendant claims that (1) the trial court improperly admitted uncharged misconduct evidence, (2) his right to due process was violated when the prosecutor appealed to the emotions of the jurors and misstated evidence, and (3) his right to due process was violated when the state withheld material evidence. We disagree with the defendant and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 2011, the defendant was a member of the G-Shine chapter of the Bloods gang in New Haven. On the night of July 30, 2011, the defendant met Tevin Williams, a fellow gang member and, together, they met the victim, Darryl McIver, who was a member of a rival gang, the Grape Street Crips. Together, the defendant, Williams, and McIver travelled throughout "the Hill" section of New Haven and committed three armed robberies.

During the first two robberies, the defendant and McIver brandished their guns while Williams searched the victims' pockets and took whatever valuables were on their respective persons, including money and cell phones. The defendant was armed with a Hi-Point nine millimeter pistol. During the third robbery, McIver pistol whipped Telaso Telez after learning that he did not have any money. Following the third robbery, McIver mentioned that he recently had shot Jason Roman, a member of the Bloods gang who went by the nickname "Scar." Shortly after that admission, the defendant pulled Williams aside to inform Williams that he was going to shoot McIver.

Later that night, the defendant and Williams followed McIver as he led them through the surrounding neighborhoods. Eventually, all three of them climbed over a perimeter fence onto commercial property on Ella Grasso Boulevard. Once on the property, McIver continued to lead the defendant and Williams, at which point the defendant drew his gun and shot McIver in the back. After shooting McIver, the defendant placed his gun on the ground, next to McIver's body, and then searched McIver's body for his gun. While the defendant was searching for McIver's gun, Williams picked up the defendant's gun, as the defendant had instructed him to do, and fled the scene. As Williams left, he heard two more gun shots.[2] After shooting McIver again, the defendant searched for McIver's phone and left the scene.

The defendant and Williams reconnected at the home of the defendant's mother, which was located near the

shooting of McIver. It was there that Williams returned the defendant's gun to him and that the defendant confessed to Williams that he had killed McIver in retaliation for McIver having shot Scar, their fellow gang member.

In early August, 2011, the defendant attended a meeting of two chapters of the Bloods at Jocelyn Square Park in New Haven. During that meeting, the defendant admitted to Luis Padilla, a fellow Blood, that he had killed McIver because McIver was "hard-headed." On August 15, 2011, the defendant was with Mickey Ferguson, a fellow Blood, at Ferguson's home, when he admitted to killing McIver.

The defendant was arrested on March 21, 2012, and charged with murder, conspiracy to commit murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, carrying a pistol without a permit, and criminal possession of a firearm. See footnote 1 of this opinion. The defendant elected a trial by jury and was tried on all charges, except criminal possession of a firearm. The jury was unable to reach a unanimous verdict with respect to the charges before it, which resulted in a mistrial. The court, however, found him guilty of criminal possession of a firearm. The state retried the defendant for murder, felony murder, robbery in the first degree, and carrying a pistol without a permit.

Prior to the start of the second jury trial, the state filed a notice of intent to introduce evidence of uncharged misconduct. On June 16, 2017, the court conducted a pretrial hearing pursuant to that notice. During that hearing, the state informed the court that it intended to present evidence of three robberies and three shootings in which the defendant was involved but was not charged. The state argued that such evidence was relevant to show identity, means, and motive, and that it would corroborate other crucial prosecution evidence. At the end of the hearing, the court noted that the defendant did not object to the evidence pertaining to the second and third shootings. The court then stated that it would hear an offer of proof during trial with regard to evidence pertaining to the first shooting. The court overruled the defendant's objection to the evidence of the Telez robbery, concluding that such evidence was probative.

During the defendant's second jury trial, the prosecutor presented evidence of three separate shootings that occurred after McIver's death, that allegedly involved the defendant, but with which he had not been charged. More specifically, the prosecutor presented evidence that the shell casings found at the scene of the other three shootings matched the shell casings found at the McIver murder scene. The evidence was admitted at trial without objections.[3]

Through the testimony of Williams, the prosecutor also presented evidence concerning the three robberies in which the defendant participated with Williams and McIver but with which he was not charged. Specifically, Williams testified that he, the defendant, and McIver committed three robberies, prior to the shooting of McIver, because they were bored.[4] As with the three shootings, the defendant did not object to the evidence admitted with regard to the first two robberies with which he was not charged.

At the conclusion of the evidence, the jury found the defendant guilty of murder, felony murder, robbery in the first degree, and carrying a pistol without a permit. Because the defendant was found guilty of murder, the court vacated his conviction of felony murder and imposed a total effective sentence of eighty years of incarceration.[5] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted various uncharged misconduct evidence, which deprived him of a fair trial. More specifically, he claims that the court improperly admitted evidence that he participated in two robberies that preceded McIver's death and evidence that he participated in three unrelated shootings that all succeeded McIver's death. We disagree.

We begin with the relevant legal principles that direct our analysis. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court . . . . [Every] reasonable presumption should be given in favor of the trial court's ruling . . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 88, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018).

It is well established, however, "that [o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial. . . . Only in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court." (Internal quotation marks omitted.) *State* v. *Thompson*, 146 Conn. App. 249, 259, 76 A.3d 273, cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013). "To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State* v. *Rosado*, 134 Conn. App. 505, 516 n.3, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012).

The defendant contends that the uncharged miscon-

duct evidence "created a serious risk that the jury would conclude that [he] had a propensity for violence." The state argues that the defendant waived appellate review of the admission of evidence concerning the two uncharged robberies because the defendant's pretrial objection to Williams' testimony was limited to the third robbery—the Telez robbery—and not all three robberies. In his reply brief, the defendant contends that he objected to the entirety of Williams' testimony, which included all three robberies.[6] With respect to the evidence regarding the three shootings with which the defendant was not charged,[7] the state argues that the claim regarding evidence of the August 1, 2011 shooting is not properly before this court because the defendant did not secure a trial court ruling on a challenge to the admission of such uncharged misconduct evidence and, thus, he has waived appellate review. In his reply brief, the defendant seems to argue that if the August 1, 2011 shooting is not properly before this court, it is because the state failed to make an offer of proof concerning any evidence that related to the incident. The defendant further argues that even if we find that his claim is unpreserved we should, nonetheless, exercise our discretion to review it because the court's error requires reversal under the plain error doctrine.[8]

As noted, prior to the defendant's retrial, the court conducted a hearing on uncharged misconduct pursuant to the state's request to admit such evidence. During that hearing, with regard to the robberies, the parties made certain representations with respect to the testimony to be offered by Williams and Telez. Although it is evident that the state's offer of proof and the defendant's response conflated the anticipated testimony of the two witnesses with respect to the robberies, to the extent that the defendant objected to evidence of the robberies, we conclude that the objection was to Williams' testimony about the third robbery and not to all three robberies. In ruling, the court surmised that Williams was to testify that he, the defendant, and McIver "were robbing somebody on Rosette Street [fifteen] minutes before . . . the homicide." Shortly thereafter, defense counsel clarified the defendant's objection, stating that "its probative value does not outweigh the prejudicial, and that it would be prejudicial as to my client—with respect to Tevin Williams." At the end of the hearing, however, the court summarized its rulings: "As to . . . the July 31 robbery of [Telazo], the objections are overruled . . . ." The defendant never sought to clarify his objection further, nor did he seek any clarification from the court. Because the defendant's objections lacked specificity with regard to the two robberies that occurred before McIver was shot, we conclude that his claim that the court abused its discretion by admitting evidence concerning those robberies was not preserved. See *Daley* v. *McClintock*, 267 Conn. 399, 404, 838 A.2d 972 (2004) ("counsel must

properly articulate the basis of the objection so as to apprise the trial court of the *precise* nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling" (emphasis added)).

Furthermore, with respect to the admission of evidence of the posthomicide shootings with which the defendant was not charged, we conclude that the record is devoid of any objections made by the defendant. During the uncharged misconduct hearing, the defendant suggested, with regard to the August 1, 2011 shooting, that the court hear testimony from Padilla as a brief offer of proof before any objections were to be made. The court agreed. The state made no offer of proof, however, and the defendant failed to object further. As to the August 15, 2011 shooting, the defendant agreed to the admission of evidence about that incident "so long as it's sanitized" pursuant to *State* v. *Collins*, 299 Conn. 567, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011),[9] and so long as the court gave a limiting instruction. With regard to the September 16, 2011 shooting, defense counsel stated "I think that [*Collins*] . . . is on point on most of [this] so . . . what I will be asking for is [a] limiting instruction, and as much as possible, to keep it to the evidence on the gun." It is clear from the record that the defendant did not object to the admission of evidence pertaining to the uncharged shootings and, accordingly, his present challenge to that evidence is unpreserved.

Having determined that the defendant failed to preserve his claim that the court improperly admitted evidence of uncharged misconduct, we turn to his request for plain error reversal.[10] First, we note that plain error is a rule of reversibility, not review. "The plain error doctrine is . . . reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he [or she] demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010); see also Practice Book § 60-5. "Furthermore, even if the error is so apparent and review is afforded, the defendant cannot prevail on the basis of an error that lacks constitutional dimension unless he [or she] demonstrates that it likely affected the result of the trial." (Internal quotation marks omitted.) *State* v. *Dews*, 87 Conn. App. 63, 69, 864 A.2d 59, cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

The defendant argues that the trial court committed plain error when it "felt bound" by *Collins* to admit evidence concerning all of the uncharged shootings and, thus, failed to balance the probative value of the uncharged shootings against the prejudicial effect of allowing the jury to hear that evidence. We disagree.

During the uncharged misconduct hearing, the court referenced *State* v. *Collins*, supra, 299 Conn. 567, several times. In *Collins*, our Supreme Court conducted an extensive review of the admissibility of uncharged misconduct evidence, including a factual scenario similar to the present case. In *Collins*, the trial court admitted evidence that the gun used in uncharged shootings was the same gun used in the underlying crime. Id., 586–93. Our Supreme Court undertook a four-pronged balancing test to determine whether the trial court in *Collins* correctly concluded that evidence of the uncharged shootings was more probative than prejudicial.[11] Although the trial court in the present case did not explicitly state that it was conducting the four-pronged balancing test from *Collins*, the questions it posed and the instructions it gave to the prosecutor demonstrate that it was applying the balancing test. Specifically, the court instructed the prosecutor to "[trim its] sails" in order to limit what information it elicited from witnesses; the court asked the prosecutor why it was necessary "to get into all the gang stuff" of the witnesses and stated that *Collin*s required caution with such an approach; the court stated that it would give a limiting instruction to the jury as to the testimony involving the uncharged misconduct; and the court instructed the prosecutor to admonish its witnesses about that to which they should not testify.

Moreover, the court, in agreement with defense counsel, stated that it would allow the prosecutor to ask leading questions on direct examination, in order to minimize prejudicial "blurt-outs." The court also gave several instructions to the jury about the uncharged shootings—instructions that were requested and approved by defense counsel.[12] Those instructions appropriately instructed the jury on the proper use of the uncharged misconduct evidence. The court also instructed the jury on the elements of the crimes charged.

We conclude that the court's statements, questions, and instructions to the prosecutor, taken together, persuade us that although it did not specifically state that it was conducting the aforementioned four-pronged balancing test, the court did balance the probative value of the evidence against its prejudicial effect in accordance with *Collins*. We further conclude that the court's determination that the evidence was more probative than prejudicial was legally correct.

As Connecticut jurisprudence provides,"[u]ncharged

misconduct evidence has been held not unduly prejudicial when the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 588. We find it significant that the three shootings with which the defendant was not charged in the present case, although dangerous and horrific, do not rise to the same severity as that of murder. We further find it significant, as previously noted, that the court instructed the prosecution to admonish its witnesses to limit their testimony. The court's devised measures for reducing the prejudicial effect of the evidence "militates against a finding of abuse of discretion." (Internal quotation marks omitted.) Id., 589. Furthermore, the court repeatedly gave a limiting instruction to the jury. See *State* v. *Mooney*, 218 Conn. 85, 131, 588 A.2d 145 (trial court's balancing was not "abuse of discretion . . . especially in light of the limiting instruction given to the jury on this issue"), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 70 (1991); see also footnote 12 of this opinion. Lastly, as our Supreme Court found in *Collins*, we too find it instructive that other jurisdictions, "have rejected challenges, founded on undue prejudice, to the use of uncharged misconduct evidence in cases wherein the charged offenses were committed using the same gun that the defendant had utilized in [other] shootings." *State* v. *Collins*, supra, 590.

Additionally, although "evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused," there are several exceptions "set forth in § 4-5 (b) of the Connecticut Code of Evidence, which provides in relevant part that [e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Internal quotation marks omitted.) Id., 582–83.

The state, in its original notice of intent to introduce evidence of the defendant's uncharged misconduct, argued that such evidence was "relevant to motive, intent, common scheme, [and] to corroborate crucial prosecution testimony." Specifically, with regard to the uncharged shootings, the state argued that the shell casings found at all the shooting scenes were linked by ballistics evidence and that such evidence related to the defendant's possession of the murder weapon, which was relevant and, thus, admissible, "for purposes of demonstrating both the identity of the shooter and . . . the means to commit these crimes." The state's argument coincides with our jurisprudence. See *State* v. *Sivri*, 46 Conn. App. 578, 584, 700 A.2d 96 ("[e]vidence indicating that an accused possessed an article with

which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime" (internal quotation marks omitted)), cert. denied, 243 Conn. 938, 702 A.2d 644 (1997). The state further argued that the various shooting incidents were indicative of motive because of the continuous gang-related tensions and violence. Again, this court has concluded that such evidence is admissible. See *State* v. *Watts*, 71 Conn. App. 27, 37, 800 A.2d 619 (2002) ("gang affiliation was particularly probative in showing . . . motive" (internal quotation marks omitted)).

Even assuming, arguendo, that the trial court abused its discretion in admitting the contested evidence, the defendant cannot satisfy his burden of proving that the court's abuse of discretion was harmful in light of its ameliorative steps. Accordingly, we conclude that the defendant is not entitled to a reversal of his conviction pursuant to the plain error doctrine. See *State* v. *Dews*, supra, 87 Conn. App. 71.

II

Next, the defendant claims that his right to due process was violated when the prosecutor committed various acts of prosecutorial impropriety.[13] More specifically, the defendant contends that the prosecutor improperly appealed to the emotions of the jurors by referring to the defendant by his nickname, "Maniac" or "Main," and by commenting on and eliciting testimony about the defendant's gang involvement. Additionally, the defendant posits that, during closing argument, the prosecutor misstated the location where the defendant admitted to Ferguson that he had killed McIver. In response, the state argues that the prosecutor's remarks did not constitute prosecutorial impropriety, and, even if they did, the sum total of the improprieties did not deprive the defendant of a fair trial. We will address each alleged impropriety in turn.

The following legal principles guide our analysis. "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . [I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . Moreover, in analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [Additionally], prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [T]he reviewing court must give due defer-

ence to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Crocker*, 83 Conn. App. 615, 656–57, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004).

"[F]ollowing a determination that prosecutorial [impropriety] has occurred . . . an appellate court must apply the . . . factors [set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial." (Internal quotation marks omitted.) *State* v. *Blango*, 103 Conn. App. 100, 112, 927 A.2d 964, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007). "Among [those factors] are [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 51, 975 A.2d 660 (2009). "In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) Id., 37.

A

The defendant claims that the prosecutor committed impropriety, during trial and during closing argument, when the prosecutor referred to the defendant by his nickname. He further contends that the nickname, "Maniac" or "Main," was not relevant to any issue in the case and that the prosecutor used it to paint the defendant "as a dangerous, violent lunatic." The state argues that the use of the defendant's nickname was "brief, isolated, and used by the prosecutor merely as a way of referring to the defendant other than as the defendant or by his given name."

The jury trial from which this appeal arises spanned six days, including five days of evidence and one day of closing argument. During the five days of evidence, there were multiple instances in which the defendant's nickname was used in either questions posed by the prosecutor or answers provided by the witnesses. The jury first heard the defendant's nickname when the prosecutor asked Williams if the defendant had a nickname. Thereafter, the prosecutor referred to the defendant by his nickname several times, without it first being used by a witness in response to a question. Addi-

tionally, during closing and rebuttal argument, the prosecutor used the defendant's nickname a total of five times.

After a careful review of the trial transcripts, we estimate that of all the times in which the defendant's nickname was used, approximately one half of those instances arose when the state's witnesses had used the nickname on their own and without any prompting. Our review further reveals that there were several instances during trial and closing argument in which the state had used the defendant's nickname in order to clarify whom the witnesses were talking about, because several witnesses had used the defendant's nickname on their own. To the extent that the prosecutor used the defendant's nickname during trial beyond the purpose of clarifying the responses of witnesses, in accordance with Connecticut jurisprudence, we conclude that such use may have been improper. See *State* v. *Santiago*, 269 Conn. 726, 755–56, 850 A.2d 199 (2004) (prosecutor's use and incorporation of nickname at least eighteen times during closing argument beyond mere reference to defendant was improper); *Camacho* v. *Commissioner of Correction*, 148 Conn. App. 488, 503, 84 A.3d 1246 ("reference to [the defendant's nickname] by the prosecutor at trial was inappropriate"), cert. denied, 311 Conn. 937, 88 A.3d 1227 (2014).

Because we conclude that, at times, the prosecutor's use of the defendant's nickname was arguably improper, we turn to an analysis of the *Williams* factors. See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). From our review of the record, we conclude that the impropriety was not invited by defense conduct or argument; the prosecutor used the defendant's nickname, unprompted by the responses of the witnesses, approximately twelve times over the course of a six day trial; and no curative measures were adopted. The prosecutor, however, presented a strong case to the jury, including, among other things, (1) testimony that the defendant twice confessed to shooting the victim, (2) testimony from a witness who saw the defendant shoot McIver, (3) video surveillance that captured the shooting,[14] and (4) evidence that shell casings found at the crime scene matched casings found at other shootings in which the defendant was involved. Given the strength of the state's case and the prosecutor's overall infrequent use of the defendant's nickname, we cannot conclude that the trial as a whole was fundamentally unfair or that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. See *State* v. *Crocker*, supra, 83 Conn. App. 656–58. It is important and significant that the defendant did not object to the use of his nickname when it occurred at trial. "A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal

quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007). Furthermore, we cannot conclude that there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the alleged improprieties. See *State* v. *Long*, supra, 293 Conn. 37. Accordingly, the use of the defendant's nickname did not deprive him of a fair trial.

B

The defendant next claims that prosecutorial impropriety occurred when the prosecutor commented on the defendant's gang involvement for purposes irrelevant to the issues. More specifically, the defendant argues that the state improperly portrayed the defendant as a high ranking gang member who controlled the actions of those who reported to him, including Williams, and that the state had continuously referenced gang involvement throughout its closing and rebuttal arguments. He further argues that it was improper for the prosecutor to elicit testimony from Padilla about his gang affiliations as well as those of Bell and Sturdivant, the individuals involved in the uncharged misconduct shootings. See footnote 7 of this opinion. In response, the state argues that the prosecutor's references to the defendant's gang involvement and the evidence thereof were relevant to the defendant's motive for killing McIver.

We begin by addressing the defendant's claim with respect to the prosecutor's comments. In his brief, the defendant directs this court to several comments made by the prosecutor during closing and rebuttal arguments. Specifically, the defendant contends that the prosecutor committed impropriety when she dedicated the first few minutes of her closing argument to detailing the "gang culture in New Haven and what it means for young men in . . . New Haven," and that "during a six week period . . . there was a lot of violence between these gangs." We are not persuaded.

In *State* v. *Taylor*, 239 Conn. 481, 503, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997), the defendant argued that the prosecutor "made several prejudicial and inappropriate remarks regarding his affiliation with the Latin Kings during its closing argument . . . ." Specifically, "[i]n its closing argument, the state asked the jury to determine that [the defendant's] Latin King pride about being asked to leave the bar . . . caused him to return for retribution, that he intentionally and maliciously killed [the victim]." (Internal quotation marks omitted.) Id., 501. Our Supreme Court concluded that the prosecutor's remarks did not constitute impropriety. The court reasoned that the defendant admitted to being a member of the gang and the prosecutor's comments "were limited to establishing [the defendant's] motive for the killing." Id., 503. Our Supreme Court has concluded that references to evidence of gang affiliation are not improper so long as they are limited to a proper pur-

pose, such as motive. See *State* v. *Wilson*, 308 Conn. 412, 430–31, 64 A.3d 91 (2013).

In the present case, although the defendant did not testify, there were several witnesses that self-identified as active members of a gang, as well as identified the defendant as their fellow or rival gang member. Furthermore, evidence presented during trial revealed that McIver's murder stemmed from an ongoing dispute between rival gangs that seemed to continue in the months after the murder. Although the prosecutor's comments were broad with respect to gang life in New Haven, we conclude that they were relevant insofar as they were limited to motive.

With regard to the defendant's claim that that the prosecutor committed impropriety by eliciting testimony about his gang affiliation, we conclude that this is an evidentiary challenge masked as prosecutorial impropriety. Therefore, we address this part of the defendant's claim as evidentiary.

As previously noted, the defendant did not object to such evidence during the trial; however, he seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See footnote 13 of this opinion. To qualify for *Golding* review, the defendant must meet four conditions.[15] See *State* v. *Golding*, supra, 239–40. "In the absence of any one of these conditions, the defendant's claim will fail." Id., 240. In accordance with Connecticut jurisprudence, we conclude that the defendant's claim as to the evidence of his gang affiliation does not meet the third requirement for *Golding* review—that the alleged constitutional violation exists and deprived the defendant of a fair trial—and, as a result, this portion of his claim fails. See *State* v. *Taylor*, supra, 239 Conn. 502–503 (*Golding* review denied because admission of evidence of gang involvement not constitutional violation depriving defendant of fair trial); see also *State* v. *Torres*, 47 Conn. App. 149, 159, 702 A.2d 142 (1997), cert. denied, 243 Conn. 963, 707 A.2d 1267 (1998).

Accordingly, we conclude that the prosecutor's comments about the defendant's gang affiliation did not constitute prosecutorial impropriety. We further conclude that the defendant's challenge to the evidence pertaining to his gang affiliation is not properly before this court.

C

Finally, the defendant argues that the prosecutor improperly stated, during closing argument, that the defendant confessed to Ferguson at the Jocelyn Square Park meeting that he had killed McIver. The defendant argues that Ferguson was not present at the meeting and that by incorrectly placing him there, the prosecutor bolstered the testimony of other witnesses whose verac-

ity about whether that meeting occurred was brought into question during trial. The state concedes that the prosecutor misstated the evidence with regard to *where* the defendant confessed to Ferguson; however, the state maintains that such a misstatement does not constitute prosecutorial impropriety because Ferguson testified that the defendant confessed to the murder. We agree with the state.

This court previously has recognized that "closing argument and closing rebuttal argument can require counsel to think on [their] feet and quickly recall and comment on evidence that was presented at trial, all while also reacting to arguments advanced by opposing counsel. Under such circumstances, it is appropriate that counsel be afforded some leeway for minor misstatements . . . in order to not impede counsel from zealously advocating for clients. . . . [I]n the heat of argument, counsel may be forgiven for hitting the nail slightly off center but not wholly inventing 'facts.' To conclude that [an] isolated [misstatement] constitute[s] a prosecutorial impropriety and that the defendant suffered harm from [it], we would need to minutely examine the prosecutor's word choice in a vacuum, ignoring the broader context of the whole trial. This is not an appropriate approach to such considerations." (Citation omitted.) *State* v. *Danovan T.*, 176 Conn. App. 637, 651–52, 170 A.3d 722 (2017), cert. denied, 327 Conn. 992, 175 A.3d 1247 (2018). Additionally, "[t]here is a distinction between misstatement and misconduct." (Internal quotation marks omitted.) *State* v. *Chankar*, 173 Conn. App. 227, 255, 162 A.3d 756, cert. denied, 326 Conn. 914, 173 A.3d 390 (2017). Not every misstatement constitutes impropriety.

During trial, the jury heard from Ferguson himself that, while he and the defendant were at Ferguson's home, the defendant confessed to killing McIver. At the conclusion of trial, the jury also heard the prosecutor incorrectly state that the defendant's confession to Ferguson took place at a park. It is clear to this court that the prosecutor misspoke. "[T]he burden [however] [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Internal quotation marks omitted.) Id., 253. This the defendant has not done. What is significant is that the admission was made, not where it was made. Therefore, we are not persuaded that, viewed in the larger context of the whole trial, this one isolated misstatement by the prosecutor constitutes impropriety.

In summary, in light of the strength of the state's overall case, notwithstanding the prosecutor's arguably improper use of the defendant's nickname, the defendant's due process right to a fair trial was not violated because we do not find that "there is a reasonable likelihood that the jury's verdict would have been differ-

ent . . . ." *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003).

### III

The defendant's third claim is that his right to due process was violated because the state withheld materially favorable evidence. Specifically, he claims that the state failed to disclose that it provided lodging and money for food and incidental expenses to a witness, Marcus Ratchford, who testified about the defendant's involvement in the September 16, 2011 shooting on Hamilton Street. He argues that such a benefit created a motive for Ratchford to testify favorably for the state and, if that information had been presented to the jury, there is a reasonable probability the defendant would not have been convicted. The state concedes that it failed to disclose its arrangement with Ratchford; however, it argues that the suppression of this evidence was immaterial. We agree with the state.

Whether the defendant was deprived of his due process rights pursuant to a *Brady* violation; see *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); is a question of law, over which we exercise plenary review. See *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 491, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007). "Our analysis of the defendant's claim begins with the pertinent standard, set forth in *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's right to a fair trial. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis added; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 699–700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence . . . (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 795, 166 A.3d 815, cert. denied, 327 Conn. 957, 172 A.3d 204 (2017). "If the [defendant] fails to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." (Internal quotation marks omitted). *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 688, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017). It is important to note, however, that "[n]ot every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation." *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 370, 71 A.3d 512 (2013).

Because the state concedes that the evidence at issue

was favorable to the defendant and that it was suppressed by the state—the first and second *Brady* prongs—but maintains that the evidence was immaterial, we address only the third *Brady* prong. Under the third prong of *Brady*, "evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 370–71.

As it is relevant to this case and the third *Brady* prong, "[t]he United States Supreme Court also has recognized that [a] jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . [I]mpeachment evidence . . . broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Citations omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 369–70. "[I]mpeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest. . . . In this connection, it is important to the *Brady* calculus whether the effect of any impeachment evidence would have been cured by the rehabilitative effect of other testimony. . . . In determining whether impeachment evidence is material, the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [impeachment evidence]." (Citation omitted; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 158–59, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

The following additional facts are relevant to our analysis. After the trial was completed, the defendant learned that the state had provided Ratchford with a hotel room and $40 a day for food and other expenses, prior to his testimony in the underlying trial. The defen-

dant believed that such undisclosed action constituted a *Brady* violation and, as a result, filed a motion for rectification for a hearing in which to question Ratchford so that he could perfect the record for this appeal. During that hearing, Ratchford testified that he was living with his mother at the time he was contacted by the state, the state arranged for him and his girlfriend to stay in a hotel and gave them money for food, he may not have been working at the time, he did not want to testify against the defendant but was subpoenaed by the state, and he stated multiple times that he did not feel that he owed the state any favorable testimony in exchange for its hotel and food benefits.

Although the evidence of Ratchford's arrangement with the state was impeachment evidence that was favorable to the defense, its relative impeachment value was low. The fact that Ratchford received a hotel room and food benefits from the state before testifying, when coupled with the fact that he had not previously come forward to testify, had some impeachment value insofar as it suggested that he had a motive for testifying. This impeachment value was greatly diminished, however, by the lack of evidence, other than temporal proximity, that Ratchford's benefit was in any way related to his decision to testify and the fact that the state had to subpoena him in order for him to testify.

Additionally, the prosecution's case did not hinge entirely on the testimony of Ratchford. Rather, as previously noted, there was ample evidence to support the defendant's conviction. See *Elsey* v. *Commissioner of Correction*, supra, 126 Conn. App. 160; see also part II of this opinion. Therefore, the state's failure to disclose its arrangement with Ratchford does not undermine our confidence in the jury's verdict, as there was not a reasonable probability that the jury would have reached a different verdict if it had considered this undisclosed impeachment evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This appeal arises from the retrial of the defendant. The defendant's first jury trial resulted in a hung jury on all charges. A separate charge of criminal possession of a firearm was tried to the court. The court found the defendant guilty of that charge and sentenced him to five years incarceration. The defendant appealed from that conviction and this court affirmed the judgment of the trial court. *State* v. *Harris*, 183 Conn. App. 865, 867, 193 A.3d 1223, cert. denied, 330 Conn. 918, 193 A.3d 1213 (2018). After the mistrial, the state retried the defendant and, in the second trial, he was found guilty by the jury on all charges.

[2] McIver died from five to six gunshot wounds, including shots to his back, chest, right forearm, and head.

[3] Further discussion and analysis on the uncharged misconduct hearing is found in part I of this opinion.

[4] According to Williams, the first robbery occurred on the corner of Dewitt Street and Lamberton Street, the second robbery occurred on the corner of Lamberton Street and Wilson Street, and the third robbery occurred on Rosette Street.

[5] The defendant was sentenced to sixty years of incarceration for murder, twenty years of incarceration for robbery, to be served consecutively to the sentence for murder, and five years of incarceration for carrying a pistol

without a permit, to be served concurrently with the sentences for murder and robbery.

[6] In his brief, the defendant argues that he preserved his claim by filing a motion in limine to establish fair procedures for determining the admissibility of evidence concerning uncharged crimes or acts of misconduct. The state, however, correctly points out that the defendant filed his motion in limine in the first jury trial and not the second jury trial. Accordingly, the defendant's motion in limine was applicable to the first jury trial, not the subsequent retrial.

[7] At the scene of the McIver shooting, the police found nine millimeter shell casings. In order to establish that the defendant had access to the guns used to shoot McIver, the prosecutor presented evidence that the defendant had committed three other shootings in the weeks following McIver's death, and that shell casings from those subsequent shootings matched those found at the scene of the McIver shooting.

The facts involving the subsequent shootings are as follows. Luis Padilla, a fellow Blood, testified at trial that on August 1, 2011, the defendant shot at Padilla along with his associate, D'Andre Bell, while they were riding their bikes (August 1, 2011 shooting). The second subsequent shooting took place on August 15, 2011, on Arch Street. That shooting involved the defendant and Kenneth Sturdivant (August 15, 2011 shooting). The third subsequent shooting took place on September 16, 2011, on Hamilton Street in New Haven (September 16, 2011 shooting). During trial, Marcus Ratchford, the brother of the defendant's girlfriend, testified that, moments before the September 16, 2011 shooting, he gave the defendant a ride to Hamilton Street. According to Ratchford, after the defendant fired a gun and returned to Ratchford's car, Ratchford saw the defendant holding a gun that had the letters "XP" or "XD" on it—the same letters that were on McIver's gun.

[8] The defendant contends that the record is adequate for review. We disagree.

[9] During the uncharged misconduct hearing, the court appeared to explain what it meant to sanitize evidence: "[Y]ou could have a witness who testified that at this time and place, which is nearby, there was a shooting, and that certain cartridge casings found investigating that shooting matched up with the weapon that you say is the murder weapon here." From the transcript, it appears to this court that the sanitization instruction to the prosecutor was a limiting instruction, in that the court was aiming to mitigate any prejudice stemming from the uncharged misconduct by limiting what information the jury would hear. The court's instruction aligns with what our Supreme Court recognized in *Collins*, that a witness should be admonished "that any testimony about the [uncharged shooting] was to be limited only to the fact that there was a shooting, with no other details regarding the events of that day." *State* v. *Collins*, supra, 299 Conn. 589. The court in *Collins* further recognized that such actions by the trial court "are significant because the care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." (Internal quotation marks omitted.) Id.

[10] In his brief, the defendant argues that it was plain error to admit evidence concerning the shootings with which he was not charged. He does not make the same argument with regard to the robberies with which he was not charged. Accordingly, our plain error analysis will address only the uncharged shootings.

[11] Our Supreme Court has held that when "determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: (1) . . . the facts offered may unduly arouse the [jurors'] emotions, hostility, or sympathy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 587.

[12] The trial court repeated the following instructions throughout the trial: "[Y]ou can consider the testimony of what supposedly happened in . . . what I'll call [a] subsequent incident for a limited purpose, and the limited purpose is to basically bolster . . . the [state's] case that it was the defendant and not someone else who committed the crimes charged in the information here, which of course is the homicide and robbery of July 31.

"The evidence that you've heard about and are going to hear about these other alleged acts of misconduct are limited to that limited purpose, and

the bottom line is that you're expressly prohibited from using evidence like this which I anticipate is forthcoming for the evidence . . . to show any bad character of the defendant or propensity to commit a criminal act.

"If you find the evidence credible and if you find that it logically and reasonably supports the issues for which it's offered, namely that the defendant was the author of the crime charged in the information here, then you can use it for that purpose if you find it credible.

"But on the other hand, if you don't believe the evidence or even if you do, if you believe it doesn't logically and reasonably support the proposition that the defendant was the perpetrator of the . . . crimes alleged in the information, then obviously you should not use this for any purpose."

[13] The defendant raises this claim for the first time on appeal and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). His claim, however, is reviewable pursuant to our Supreme Court's holding in *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004). In *Stevenson*, our Supreme Court concluded that, in cases of alleged prosecutorial impropriety, "it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-prong *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Footnote omitted.) *State* v. *Stevenson*, supra, 572–73.

[14] Surveillance video footage from the commercial property on Ella Grasso Boulevard was presented at trial. Williams identified himself, McIver, and the defendant in the video. Williams also identified the defendant shooting McIver, placing his gun next to McIver, grabbing McIver's gun and phone, then fleeing the scene.

[15] The four conditions are: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.