******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* HENRY B.-A.*
(AC 46967)

Clark, Seeley and DiPentima, Js.

*Syllabus*

Convicted, following a jury trial, of sexual assault in the second degree and risk of injury to a child, the defendant appealed. He claimed that he was deprived of his due process right to a fair trial as a result of improper remarks the prosecutor made during closing and rebuttal arguments to the jury. *Held*:

The prosecutor did not improperly vouch for the victim's credibility when he referred to the defendant by his nickname, "Zeus," as that reference was based on the victim's testimony, as well as a message and a video the defendant had sent her that was admitted into evidence, and the prosecutor never made a statement that could be construed as his personal opinion concerning the victim's veracity.

The defendant's assertion that the prosecutor's statements that the defendant had threatened the victim and that she cried when he sexually abused her were comments on facts that were not in evidence and improperly appealed to the jurors' emotions was unavailing, as those statements were based on the evidence or reasonable inferences that could be drawn therefrom.

This court was not persuaded that the prosecutor's statement that the victim "got victimized in the hospital," made during the prosecutor's discussion of the medical examination that the victim underwent at the hospital after disclosing the sexual abuse, improperly appealed to the jurors' emotions, as the jury reasonably could have inferred from the prosecutor's statement that the defendant had continued to victimize the victim while she was at the hospital, in that his presence there compounded the vulnerable state she was in while undergoing an invasive medical examination.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

There was no merit to the defendant's unsupported claim that the prosecutor injected the trial with sarcasm by referring to the defendant by his nickname, "Zeus," which was based on the victim's testimony, and the trial transcript demonstrated that the prosecutor merely substituted the nickname in place of referring to the defendant.

Although the prosecutor improperly stated that the victim's mother had known that the defendant had been referring to himself as "Zeus," that single, isolated transgression did not substantially prejudice the defendant or deprive him of a fair trial, as it was not severe when considered in the context of the entire trial, defense counsel did not perceive it as warranting an objection, it was neither egregious nor inexcusable, and the prosecutor's improper statement was not, as the defendant contended, central to the victim's credibility but was one aspect of her extensive, detailed testimony about the defendant's sexual abuse of her that did not affect the jury's consideration of the evidence.

Argued April 16—officially released August 5, 2025

*Procedural History*

Substitute information charging the defendant with three counts of the crime of risk of injury to a child and one count of the crime of sexual assault in the second degree, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *E. Richards, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Gary A. Mastronardi*, assigned counsel, for the appellant (defendant).

*Heather M. Mansfield*, certified legal intern, with whom were *Ronald G. Weller*, senior assistant state's attorney, and, on the brief, *Joseph T. Corradino*, state's attorney, *Joseph J. Harry*, senior assistant state's attorney, and *Alexander O. Kosakowski*, certified legal intern, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Henry B.-A., appeals from the judgment of conviction, rendered following a jury trial, of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), risk of injury to a

child in violation of General Statutes § 53-21 (a) (1), and two counts of risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant claims that he was deprived of his due process right to a fair trial as a result of prosecutorial improprieties that allegedly occurred during the prosecutor's closing and rebuttal arguments. We disagree and affirm the judgment of the court.

The jury reasonably could have found the following facts on the basis of the evidence presented at trial. The victim, who was from Puerto Rico, came to New York in September, 2015, with her mother and two siblings when she was twelve years old. Upon arriving in New York, the victim and her family initially lived with the defendant and his family, which included the defendant's mother, Brenda A., and his brother, Joshua A. Brenda A. is the victim's aunt, and the defendant and the victim are cousins, although their relationship was more akin to that of uncle and niece. Shortly thereafter, the victim and her family lived part-time with a different aunt in Connecticut and continued to reside in New York at the residence of the defendant's family on weekends until December, 2015, when the victim and her family moved to a residence in Bridgeport. Throughout this time and afterward, the two families continued to socialize and visit with one another.

The victim met the defendant for the first time when she came to New York. She testified that she initially got along with the defendant, who referred to the victim by the nickname "Negrita."[1] The victim testified that by January, 2016, her relationship with the defendant had changed in that "[h]e treated [her] with more love than normal." She explained that "the relationship [of]

---

[1] According to the victim, with the exception of some of her family members who live in Puerto Rico, only the defendant referred to her by this nickname.

uncle-niece became closer and it was more affectionate when we got to know each other," although she was not becoming more affectionate with the defendant. According to the victim, in or about January and February, 2016, the defendant also gave the victim the nickname of "Athena," while referring to himself as "Zeus, the God."

In March, 2016, the defendant came to the victim's thirteenth birthday party at her residence in Connecticut. During that visit, the defendant gave the victim a chain with a heart and the initial of her first name. The victim also received a cell phone as a gift from her mother. The victim testified that, after she received the cell phone, the defendant would communicate with her via Snapchat and acted "with more affection than normal" toward her.

In the beginning of April, 2016, the victim and her family went to the defendant's house in New York to celebrate his twenty-sixth birthday and stayed overnight. As part of the sleeping arrangements for that evening, the victim was supposed to sleep in the living room with Brenda A. on an inflatable mattress. Brenda A., however, just prior to falling asleep on a couch, told the victim to go sleep in the bedroom of the defendant, who had left the residence briefly to take a friend home. Because the door to the defendant's bedroom was locked, the victim waited for him to come home, and when he did so, she explained that his mother had told her to sleep in his bedroom. They entered the defendant's bedroom, he locked the door, and the victim began to fall asleep when the defendant started to touch her legs and tried to pull down her pants. When the victim asked the defendant what he was doing, he responded that "nothing bad would happen to [her]." After the defendant pulled down the victim's pajamas and panties, she started to cry and asked what he was doing, and the defendant told her not to scream because

her mother would "scold" her. Thereafter, the defendant stood up, retrieved a condom, and took out a gun and put it on top of a shelf in the bedroom, after which he told the victim that, if she "said something or . . . screamed, something would happen to [her] and [her] family." The victim continued to cry as the defendant forcefully opened the victim's legs and penetrated her vagina with his penis. He also forced his penis into the victim's mouth. While this occurred, the victim continued to struggle and cry out loud, and the defendant placed his hand over her mouth. When the defendant was finished, he made the victim promise that she would not say anything and allowed her to go to the bathroom, where she discovered that she was bleeding. The victim testified that she was scared the next morning and did not tell her mother what had happened.

The victim's mother testified that, on the morning after the defendant's birthday party, she noticed that the victim woke up in the defendant's bedroom, that the victim explained that Brenda A. had told her to sleep there, and that the victim was acting "scared" and "was not being herself." Subsequently, through the rest of April and continuing to October, 2016, the defendant, along with his mother and brother, frequently visited the victim's home in Connecticut on weekends, staying overnight. The victim testified that, during many of those overnight stays, the defendant sexually assaulted her by penetrating her vaginally and anally, and forcing her to perform oral sex.[2] The defendant also continued

---

[2] For example, the victim testified regarding a visit to her home by the defendant's family on the weekend of May 14, 2016. That evening, the victim went to sleep in her bedroom with her brother and sister. The defendant came into the bedroom and pulled on the victim's feet to get her attention, and when she indicated that she did not want to go with him, he pointed his finger at her younger sister, which frightened the victim, who did not want anything to happen to her sister. The victim thus went with the defendant to her brother's bedroom, where the defendant was sleeping by himself for that evening. The defendant showed the victim a pornographic video on his cell phone, stating that that was what he was going to do to the victim. Thereafter, he pushed the victim onto the bed, took her clothes off, and

to communicate with the victim via Snapchat, reminding her not to tell anyone what had happened. He also would tell her that there was nothing wrong with what he was doing and that "he was just loving" the victim.

By May, 2016, the victim's mother had noticed a change in the victim's demeanor. She recalled that, prior to that time, the victim "was a happy girl, kind, she was always dancing, she loved modeling and singing, she was always singing. She was respectful, [a] good daughter, [and a] good sister." The victim also previously never had night terrors or issues with sleeping, school, or bodily functions such as defecating or urinating.[3] By May, 2016, however, the victim's mother noticed that the victim "was always sad, she always wore a hoodie, she covered herself. She was not the same. She had panic attacks. She didn't comb her hair." Between April and September, 2016, the victim also began to have panic attacks at school.

In October, 2016, the defendant spent the Columbus Day weekend at the victim's home in Bridgeport, staying until Monday. On Monday, October 10, 2016, after the victim's mother went to work, the defendant penetrated the victim anally, made the victim perform oral sex on him, and gave the victim a hickey on her neck. When the victim's mother returned from work, she discovered the hickey on the victim's neck. The victim initially told her mother that she got the mark when she was playing and roughhousing with her brother. Thereafter, the victim's mother took her into the bathroom and demanded to be told the truth. Ultimately, the victim acknowledged that the defendant was abusing her and was

inserted his penis into her vagina. Afterward, the defendant threatened to take the victim away to Canada "because in Canada he would be able to marry a minor," and he stated that he "was able to do to [the victim] whatever he wanted."

[3] The victim testified that, following the sexual assaults by the defendant, she had difficulty urinating and having bowel movements, and she had trouble sleeping and experienced nightmares.

responsible for the hickey on her neck. By the time the victim exited the bathroom, the defendant was gone. The victim's mother called the police, who came to her home and took a statement from the victim's mother, and the victim went to the emergency department at Bridgeport Hospital the next day, where she underwent a medical examination.[4] While the victim was at the hospital, the defendant came to the hospital and tried to talk with Sergeant Paul Scillia of the Bridgeport Police Department, who had gone to the hospital to provide assistance regarding the victim's complaint of sexual abuse. Specifically, the defendant wanted to talk with Scillia about a crime of which he thought he might be accused. Scillia obtained information from the defendant, including his phone number and driver's license, of which he made a photocopy, and passed the information to the police officer who was investigating the matter. The victim was informed of the defendant's presence at the hospital while she was there. When a doctor was asking her questions at the hospital, the victim was "[n]ervous, she was crying."

Subsequently, the victim met with Brenda L. Concepcion, a licensed clinical school social worker, for a forensic interview. During that interview, the victim reported that her cousin, the defendant, had been sexually abusing her, and she described the first sexual assault that occurred in New York the night of the defendant's birthday party. The victim also was examined by Janet L. Murphy, a registered nurse who specializes in child sexual abuse. In her report regarding that

---

[4] At the hospital, the victim was examined by Nurse Emma Myers, who conducted a preexamination of the victim, and Dr. Thomas Lamonte, who conducted an examination of the victim's genital area. At that time, the victim had bruising and bite marks on her neck, and had complained of pain while urinating and having bowel movements. The victim also reported pain "[a]nally, vaginally, and orally." Myers testified that the victim had "physical indicators of sexual abuse," even though the rest of her examination of the victim's body appeared to be normal. Following his examination of the victim, Lamonte did not document any abnormal findings.

examination, Murphy noted the concerns of the victim's mother that, for the past four to five months, the victim had been "staying in her room, was not eating, stopped making herself look pretty with makeup, [has been] having panic attacks . . . [and] was having problems with constipation and bleeding from her rectal area with [bowel movements]." In her assessment set forth in her report, Murphy, after noting the victim's allegations of sexual abuse by her cousin, stated that the examination revealed "normal genitalia and anus," and that "[a] normal exam neither confirms not refutes the possibility of sexual abuse," as "[m]ost children or teens who have experienced sexual abuse, including those having experienced penetration, will have a normal exam." She also noted that the victim's "[g]enital and anal complaints" could "be a consequence of the alleged sexual trauma." Claudia King, an employee with the Department of Children and Families (department), also met with the victim and her family for the purpose of assisting the family with any services it needed.

After October 10, 2016, the defendant no longer went to the victim's home for weekend visits, and the victim had no communication with the defendant until he contacted her in December, 2017, via Snapchat. The victim was in a classroom at school when she received the communication, which came in the form of a text message and a short, five second video of the defendant, both of which were admitted into evidence. The message referred to the victim by her nickname, Negrita, stating, "it's Zeus. I saw you, you're beautiful. Take care a lot. And I only ask you not to say that it was me or to say that it was not me." When the victim saw the video and message, she had an anxiety attack and was taken to the hospital by ambulance.

The defendant subsequently was arrested and charged in an amended substitute information with sexual assault in the second degree in violation of § 53a-71 (a)

(1), risk of injury to a child in violation of § 53-21 (a) (1), and two counts of risk of injury to a child in violation of § 53-21 (a) (2). The case was tried to a jury. The state presented testimony from a number of witnesses, including, inter alia, the victim; the victim's mother; Scillia; Concepcion; Murphy; and King.

The state also presented expert testimony from Lisa Melillo, a nationally certified school psychologist and forensic interviewer. Melillo never interviewed or examined the victim; she presented expert testimony regarding behavioral characteristics of children after they had been sexually abused and aspects of forensic interviewing. She testified that it is "extremely difficult for a child to report sexual abuse," and that the child's abuser is often someone very well known to the child and who is in a position of trust and authority with respect to the child. When asked whether, if the abuser is a relative of the child, the child can have both a respectful relationship and a hateful relationship, she responded in the affirmative, stating that the sexual abuse is one aspect of the relationship and does not define it, and that the child can still have loyalty to his or her abuser, yet also, at times, be fearful of the abuser. Additionally, the state introduced various exhibits into evidence, including, inter alia, the copy of the defendant's driver's license Scillia had made at the hospital, various photographs, the Snapchat message and video, medical records of the victim, a transcript of the victim's forensic interview and a report summarizing the interview prepared by Concepcion, and a report by Murphy.

The jury returned verdicts of guilty on all four counts. On June 14, 2023, the court sentenced the defendant to a total effective term of twenty years of incarceration, execution suspended after fifteen years, nine months of which were mandatory, and ten years of probation with conditions. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims that he was deprived of his due process right to a fair trial as a result of prosecutorial improprieties that allegedly occurred during the prosecutor's closing and rebuttal arguments. Specifically, he contends that certain remarks of the prosecutor improperly vouched for the credibility of the victim, appealed to the passions and emotions of the jurors, and referred to facts not in evidence. The defendant further contends that the cumulative effect of these improprieties deprived him of his due process right to a fair trial. We address these contentions in turn.

We first set forth general principles governing our review of claims of prosecutorial impropriety. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Turner*, 181 Conn. App. 535, 557, 187 A.3d 454 (2018), aff'd, 334 Conn. 660, 224 A.3d 129 (2020); see also *State* v. *Taft*, 306 Conn. 749, 762, 51 A.3d 988 (2012). "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety]

was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . . The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant has failed to establish either prong. . . . *State* v. *Pernell*, 194 Conn. App. 394, 403–404, 221 A.3d 457, cert. denied, 334 Conn. 910, 221 A.3d 44 (2019).

"Because the claimed prosecutorial improprieties occurred during [closing and] rebuttal . . . argument[s], we also set forth the following legal principles. It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider. . . . *State* v. *Courtney G.*, 339 Conn. 328, 341–42, 260 A.3d 1152 (2021)." (Internal quotation marks omitted.) *State* v. *Maurice B.*, 228 Conn. App. 720, 726–28, 324 A.3d 850, cert. denied, 350 Conn. 929, 326 A.3d 249 (2024).

Furthermore, in cases in which defense counsel did not object to any of the remarks that form the basis of a claim of prosecutorial impropriety on appeal, "[o]ur Supreme Court has explained that a defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time.[5] . . . *State*

---

[5] "[U]nder settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding*

v. *Ross*, 151 Conn. App. 687, 694–95, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014)." (Footnote in original; internal quotation marks omitted.) *State* v. *Maurice B.*, supra, 228 Conn. App. 728–29. Keeping these principles in mind, we turn to the defendant's claims.

I

The defendant first claims that, during closing and rebuttal arguments, the prosecutor improperly vouched for the credibility of the victim when the prosecutor repeatedly referred to the defendant as "Zeus." In particular, the defendant asserts that, "on no less than eight separate occasions[6] during the course of the state's

test. . . . *State* v. *Courtney G.*, supra, 339 Conn. 340 n.4." (Internal quotation marks omitted.) *State* v. *Maurice B.*, supra, 228 Conn. App. 729 n.12.

[6] The defendant describes the eight instances as follows:

"(1) In addressing, during summation, [the victim's] claim in her testimony that, on October 10, 2016, she was alone with the defendant at her residence in Connecticut because the defendant's mother and brother, who had come to Connecticut with the defendant, had left without him and returned to New York, the prosecutor sarcastically remarked: 'Brenda [A.] [took] Joshua [A.] [and they went] home . . . leaving *Zeus* with [the victim]' . . . .

"(2) In suggesting to the jury that the defendant had intimidated [the victim] because the notable difference in size and stature between the defendant and [the victim] had prevented [the victim] from even thinking about resisting the defendant's sexual advances, the prosecutor sarcastically asked the jury: 'What do you think *Zeus* is going to do to her [if she resisted him]?' . . .

"(3) In addressing the purported physical injuries [the victim] claimed the defendant's alleged sexual abuse had inflicted on her, the prosecutor sarcastically observed: '[The victim] said she had no physical problems before April [of 2016]. No nightmares, no urinary problems, no defecation problem. And all of a sudden in April, *after Zeus went at her*, she started getting nightmares, urinary problems, defecation, stomach issues, issues in school.' . . .

"(4) At the trial, the defense presented to [the victim], during cross-examination, a video and some spring and summer vacation photographs, all of which had been generated during the relevant period between April and October of 2016. The photographs and video depicted [the victim], with either the defendant, or with members of both families, and the individuals depicted, including [the victim], all, obviously, were shown to be happy and smiling, and having a good time together. In commenting on the evidentiary weight to which the prosecutor believed the jury should give that photo-

summation, the prosecutor sarcastically 'gave the defendant a title,' i.e., 'Zeus,' which painted [the complainant] as a victim and the defendant as a groomer and sexual abuser of children, thereby improperly planting in the minds of the jurors the state's endorsement that the defendant was guilty as charged. Clearly, each time, during his summation, that the prosecutor labelled the defendant 'Zeus,' the prosecutor's undeniable intent was to indirectly, and improperly, vouch for the credibility of [the victim's] testimony." (Footnote added; footnote omitted.) We are not persuaded.

"[Although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is

---

graphic evidence, he sarcastically remarked: '[I]f you notice . . . those photos and their video [were] shot during the daytime, okay, *when there [were] other people around and Zeus didn't have, you know, access to her.*' . . .

"(5) In addressing the defense argument that [the victim] never reported any of the threats which she now claimed the defendant had made to her and her family, the prosecutor sarcastically stated: '[N]ow, defense counsel has repeatedly asked [the victim], you never told [anybody] about [your] fear . . . . I submit to you on pages 7, 15, 24 and 33 [of Concepcion's report] [the victim] exhibits *the fear that Zeus put her through.*' . . .

"(6) Toward the end of his initial argument in summation, he stated: '[The victim] got victimized for six months. She got victimized in the hospital. And for three days, we questioned her on the most private areas . . . [a]nd at no time did she waver. . . . We have the medical evidence; we have her in therapy. . . . It's your decision whether to believe her or not because the elements are there.' He then remarked, sarcastically: 'You only have to find if he has sexual contact—*Zeus had sexual contact with [the victim]* between April and September of 2016. . . . You find that, the defendant is guilty as charged.' . . .

"(7) The prosecutor then concluded the initial portion of his argument by first reminding the jury that its verdict must be based on the evidence and, then, by telling the jury: '[Y]ou look at the defendant and you *find Zeus guilty*' . . . .

"(8) Finally, in his rebuttal argument, in response to a claim by the defense attacking the adequacy of the police investigation based upon, inter alia, the failure of the police to photograph the alleged crime scenes, the prosecutor sarcastically asked: 'Who cares [if the police took pictures of] the room[s]? *Does that affect whether Zeus violated [the victim]*?' " (Citations omitted; emphasis in original.)

not permitted *to vouch personally* for the truth or veracity of the state's witnesses." (Emphasis added; internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 558, 280 A.3d 446 (2022); see also *State* v. *Baltas*, 311 Conn. 786, 826–27, 91 A.3d 384 (2014) ("[a] prosecutor may not impermissibly vouch for a witness' credibility by expressing his or her own *personal opinion* as to the credibility of a particular witness" (emphasis added)). "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . We have held, however, that [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citation omitted; internal quotation marks omitted.) *State* v. *Elmer G.*, 176 Conn. App. 343, 376, 170 A.3d 749 (2017), aff'd, 333 Conn. 176, 214 A.3d 852 (2019); see also *State* v. *Gary S.*, 345 Conn. 387, 411–12, 285 A.3d 29 (2022) ("A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.)).

We disagree with the defendant's assertion that the prosecutor impermissibly vouched for the victim's credibility when he referred to the defendant by his nickname "Zeus" during closing and rebuttal arguments. First, the victim testified at trial that the defendant gave her the nickname of "Athena" and referred to himself as "Zeus, the God," and the Snapchat message to the victim from "Zeus," along with the video from the sender, were admitted into evidence. The prosecutor's references to the defendant as "Zeus," therefore, were based on that testimony and evidence. Second, in the eight instances that the prosecutor referred to the defendant as Zeus to which the defendant directs our attention; see footnote 6 of this opinion; the prosecutor never once made a statement that can be construed as a statement of *his personal opinion* concerning the veracity of the victim's testimony, either directly or indirectly. We do not agree that these references by the prosecutor to a nickname attributed to the defendant, alone, constituted improper vouching for the veracity of the victim's testimony. See, e.g., *State* v. *Michael T.*, 338 Conn. 705, 730–31, 259 A.3d 617 (2021) (prosecutor's rhetorical question and statements appealing to jury to evaluate victim's credibility—stating that " '[t]he state submits to you [that the victim's emotions] absolutely . . . were [real],' " and that " 'it is [hard] to fake emotion like you saw [in] the forensic [interview] and on that witness stand' "—were not improper, as "the statements appealed to the jurors' common sense and life experiences, and referred to evidence that had been presented at trial"); *State* v. *Ciullo*, 314 Conn. 28, 42, 100 A.3d 779 (2014) ("four claimed instances of vouching in the prosecutor's closing argument [did] not purport to convey the prosecutor's *personal opinion* of the credibility of the witnesses; instead, the prosecutor's statements, when placed in the context in which they were made, are reasonable inferences the jury could

have drawn from the evidence adduced at trial'' (emphasis in original)); *State* v. *Baltas*, supra, 311 Conn. 826–27 (The prosecutor did not impermissibly vouch for the witness' credibility during closing argument but, rather, ''merely urged the jury not to disbelieve [the witness'] testimony solely because of her lifestyle. Such a comment did not suggest that the prosecutor 'may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions' . . . which is the evil this rule is designed at preventing. A prosecutor is always free 'to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom' . . . which is what the prosecutor did here.'' (Citations omitted.)).

Finally, we note that the nickname Zeus does not intrinsically have a negative connotation such that its use by the prosecutor was inherently improper.[7] See,

---

[7] We note that the defendant has not directed our attention to any Connecticut authority to support his claim that the prosecutor's references to his nickname were improper. Rather, he asserts that, ''just as it would be improper for a defendant to be called a criminal or guilty person [at] trial, giving a [defendant] a title that assumes the defendant's guilt tends to undermine the principle that the state has the burden to prove guilt beyond a reasonable doubt.'' (Emphasis omitted; internal quotation marks omitted.) In his principal appellate brief, the defendant mistakenly attributes this quoted language to our Supreme Court's decision in *State* v. *Thompson*, 266 Conn. 440, 472–73, 832 A.2d 626 (2003). The language, instead, derives from a decision of the Supreme Court of Oregon in *State* v. *Sperou*, 365 Or. 121, 133–34, 442 P.3d 581 (2019), in which the court stated that, ''giving *a complaining witness* a title that assumes a defendant's guilt'' undermines the state's burden to prove guilt beyond a reasonable doubt. (Emphasis added.) The defendant also cites *State* v. *Albino*, 130 Conn. App. 745, 762, 24 A.3d 602 (2011), aff'd, 312 Conn. 763, 97 A.3d 478 (2014), for the proposition that, ''in a case where there is a challenge as to whether a crime occurred, repeated use of the [word] victim . . . is improper.'' We find *Albino* to be factually inapposite to the present case, in which the term victim was not used and the nickname attributed to the defendant in no way painted the complainant as a victim. In other words, referring to the defendant by a nickname that was supported by testimony at trial is not the same as referring to a complaining witness as a victim in a case in which a dispute exists as to whether a crime occurred. Moreover, the prosecutor did not give the defendant a title; rather, he referred to the defendant by a nickname, which came into evidence through the testimony of the victim.

e.g., *State* v. *Huckabee*, 41 Conn. App. 565, 573, 677 A.2d 452 (defendant's nickname " 'Snake' " was not sufficiently negative to warrant limiting instruction), cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996). But see *State* v. *Santiago*, 269 Conn. 726, 755–56, 850 A.2d 199 (2004) (The prosecutor's repeated use of the defendant's nickname, " 'Danger,' " during closing argument was improper, especially because the prosecutor did not use it "merely to refer to the defendant, but also incorporated it into his argument when he stated: '[R]eal danger lurked around the corner in the name of Daniel Santiago. That's who it is. That's Danger.' "); *State* v. *Thompson*, 266 Conn. 440, 472–73, 832 A.2d 626 (2003) (prosecutor's repeated references to defendant as " 'killer' " stigmatized defendant and "were improper comments on the defendant's guilt"); *State* v. *Couture*, 194 Conn. 530, 561, 562–63, 482 A.2d 300 (1984) (prosecutor's statements that defendant and codefendant were " 'murderous fiends,' 'rats,' 'utterly merciless killers' and 'inhumane, unfeeling and reprehensible creatures' " were stigmatizing, egregious and improper), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Holloway*, 116 Conn. App. 818, 842, 977 A.2d 750 (prosecutor's "inappropriate and inflammatory language" referring to defendant as "rapist" was improper), cert. denied, 294 Conn. 902, 982 A.2d 646 (2009); *State* v. *McCarthy*, 105 Conn. App. 596, 630, 939 A.2d 1195 (prosecutor's two references to witnesses "as 'bums' was improper and inappropriate" because "[t]he term 'bum' is pejorative and disrespectful"), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). We, therefore, reject the defendant's first claim.[8]

## II

Next, the defendant claims[9] that the prosecutor improperly appealed to the passions and emotions of

[8] "Because we conclude that there was no prosecutorial impropriety as claimed by the defendant, we need not address the *Williams* factors." *State* v. *Robert B.*, 200 Conn. App. 637, 650, 240 A.3d 1077 (2020).

[9] We address the defendant's claims in an order different from the one presented in his principal appellate brief.

the jurors, and, at the same time, referred to facts not in evidence. This claim is premised on the prosecutor's statements during closing argument that (1) "[the defendant] was [the victim's] uncle and she's Latino, she's supposed to respect him. . . . She cried, no one heard. He threatened her, no one heard," and (2) the victim "got victimized in the hospital." The defendant also asserts that "the prosecutor's references during summation to the defendant as 'Zeus' involved a distinct element of 'sarcasm,' " citing *State* v. *Rizzo*, 266 Conn. 171, 263–64, 833 A.2d 363 (2003), for the proposition that "the use of needless sarcasm by the state's attorney called upon the jurors' feelings of disdain, and likely sent them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument was permissible and appropriate for them to use. . . . It is the responsibility of the state's attorney, however, in the exercise of his high office, to attempt to avoid expressing those feelings in needless and inappropriate ways. That responsibility [is] not met when [a] state's attorney engag[es] in excessive sarcasm in his final argument to the jury . . . ." We address these alleged instances of impropriety in turn.

We first set forth relevant legal principles that guide our resolution of these claims. "It is well established that a prosecutor should not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the

jurors and those that are permissible rhetorical flour-ishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible. . . . By contrast, statements that have no reasonable connection to evidence offered or issues presented in a case are more likely to be deemed improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Sullivan*, 351 Conn. 798, 812, 334 A.3d 446 (2025).

"[T]he prosecutor [also] has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . [Although] the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Dabate*, 351 Conn. 428, 451, 331 A.3d 1159 (2025).

We do not agree with the defendant that the prosecu-tor improperly appealed to the emotions of the jurors and commented on facts not in evidence when he made the statements that the victim was supposed to respect the defendant because he was her uncle and that "[s]he

cried, no one heard. He threatened her, no one heard
. . . .'' First, the defendant asserts in a conclusory fash-
ion that those statements appealed to the emotions of
the jurors, without providing an explanation or analysis
of how they did so. Second, he asserts that "there was
no evidence that [the victim] had ever cried out, wanting
to be heard, or that she had been threatened in a way
that people might have been able to hear her.'' (Internal
quotation marks omitted.) We disagree with the defen-
dant's characterization of the prosecutor's statements
and conclude that the statements were based on the
evidence in the record or reasonable inferences there-
from.

The jury had before it testimony that the victim and
the defendant had an "uncle-niece relationship.'' The
state also presented expert testimony from Melillo regard-
ing sexual abuse of a child when the abuser is a family
member. Melillo testified that the child who is being
sexually abused can have a respectful relationship dur-
ing the daytime with the family member who is perpe-
trating the abuse but can be fearful of that person and
feel threatened at night. Additionally, the victim testi-
fied that she cried during some of the sexual assaults
and that the defendant had covered her mouth with his
hand. There also was testimony that the sexual assaults
occurred when a number of other individuals were
sleeping in the homes at the time, and no witness testi-
fied to having heard anything during the incidents of
sexual abuse described by the victim. The victim also
testified concerning various threats that the defendant
had made to her about keeping quiet regarding the
sexual abuse. Thus, the prosecutor's statement that the
victim cried and no one heard her was supported by
the testimony in the record and did not suggest that
the victim cried because she wanted to be heard. The
same is true regarding the prosecutor's statement about
the defendant's threats; the victim testified that the

defendant had threatened her during the assaults, when family members were in nearby bedrooms, and there was no testimony from anyone who was in the homes at the time of the sexual assaults that such threats were heard.

We also are not persuaded by the defendant's claim that the prosecutor improperly appealed to the jurors' emotions and commented on facts not in evidence when he told the jury that the victim "got victimized in the hospital . . . ." We examine this statement in the context in which it was made, namely, while the prosecutor was discussing the invasive medical examination that the victim underwent at the hospital, after having been sexually abused for six months. Also, while at the hospital, the victim was made aware that the defendant was there as well, and she testified that, at that time, she was still afraid to tell people what had happened to her. Under these circumstances, we conclude that the jury reasonably could have inferred from the prosecutor's statement that the defendant continued to victimize the victim while she was at the hospital, in that his presence there compounded the vulnerable state she was in while undergoing an invasive medical examination.

Finally, we find no merit to the defendant's claim that there was an element of sarcasm in the prosecutor's references to the defendant as Zeus. We are unable to discern any sarcastic tone in those references from the transcripts of the trial. The references were based on the victim's testimony that the defendant used the nickname Zeus, and the transcript demonstrates that the prosecutor, in a number of instances, merely substituted the nickname Zeus in place of referring to the defendant.

"It is well settled that [a] prosecutor may not seek to sway the jury by unfair appeals to emotion and prejudice . . . . [O]ur Supreme Court has recognized that

repetitive and excessive use of sarcasm is one method of improperly swaying the fact finder. . . . Additionally, we have recognized that the excessive use of sarcasm may improperly influence a jury. . . . A prosecutor's frequent and gratuitous use of sarcasm can [call on] the jurors' feelings of disdain, and likely sen[d] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use." (Internal quotation marks omitted.) *State* v. *Turner*, supra, 181 Conn. App. 565. The present case, however, does not present such a situation. There is no support in the record for the defendant's claim that the prosecutor improperly injected the trial with sarcasm. This claim, therefore, fails.[10]

### III

The defendant's next claim is that the prosecutor improperly commented on facts that were not in evidence when he suggested that the victim's mother knew that the defendant called himself Zeus. We are not persuaded that the challenged comment of the prosecutor deprived the defendant of a fair trial.

The following additional facts are relevant to our resolution of this claim. At trial, King, a department employee, testified as a witness for the state. During her testimony, King stated that, as part of her investigation into the allegations of sexual abuse of the victim, she spoke with the victim's mother, who had relayed to King information regarding the defendant and Brenda A. Specifically, the victim's mother mentioned to King that, in May or June, 2016, she had warned Brenda A. about the defendant and the victim. The victim's mother also testified about this issue, stating that, sometime in May or June, 2016, she had told King that she was worried about the defendant and asked Brenda A. to

---

[10] See footnote 8 of this opinion.

watch out for her daughter. During his closing argument, the prosecutor summarized King's testimony and stated: "Now, you heard . . . King . . . . King testified . . . that she interviewed . . . [the victim's mother] . . . . And she also indicated that . . . in May and June of 2016 . . . [the victim's mother] warned Brenda [A.] [to] watch the relationship of Zeus—she didn't say Zeus, *but knew he was calling himself Zeus* other than [the victim]." (Emphasis added.)

The defendant asserts that "nowhere in King's testimony does she ever say that [the victim's mother] had reported to [the department] a conversation with [Brenda A.] in which [the victim's mother] warned her to '*watch the relationship of Zeus.*' " (Emphasis in original.) The defendant further contends that, "[n]ever once, during either the prosecutor's direct examination or the [defense] cross-examination, did [the victim's mother] ever even hint that she had *any* knowledge whatsoever, must less *personal* knowledge, that the defendant had, in the past, referred to himself as 'Zeus.' " (Emphasis in original.) The state counters by arguing, inter alia, that, even if the prosecutor's comment did refer to facts not in evidence, "it was an isolated misstatement that did not rise to the level of an impropriety."

It is well established that "[a] prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he . . . may not invite sheer speculation unconnected to evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record." (Citation omitted; internal quotation marks omitted.) *State* v. *Turner*, supra, 181 Conn. App. 560. "Statements as to facts [that] have not been proven amount to unsworn testimony . . . . [W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has

independent knowledge of facts that could not be presented to the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Michael T.*, supra, 338 Conn. 720.

"There is [however] a distinction between misstatement and misconduct. *State* v. *Dawes*, 122 Conn. App. 303, 314, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010); see also *State* v. *Orellana*, [89 Conn. App. 71, 105, 872 A.2d 506] (isolated misstatement not prosecutorial impropriety) [cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005)]. . . . [W]e do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Chankar*, 173 Conn. App. 227, 255, 162 A.3d 756, cert. denied, 326 Conn. 914, 173 A.3d 390 (2017). "This court previously has recognized that closing argument and closing rebuttal argument can require counsel to think on [their] feet and quickly recall and comment on evidence that was presented at trial, all while also reacting to arguments advanced by opposing counsel. Under such circumstances, it is appropriate that counsel be afforded some leeway for minor misstatements . . . in order to not impede counsel from zealously advocating for clients. . . . [I]n the heat of argument, counsel may be forgiven for hitting the nail slightly off center but not wholly inventing facts. To conclude that [an] isolated [misstatement] constitute[s] a prosecutorial impropriety and that the defendant suffered harm from [it], we would need to minutely examine the prosecutor's word choice in a vacuum, ignoring the broader context of the whole trial. This is not an appropriate approach to such considerations. . . . Not every misstatement constitutes impropriety." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 198 Conn. App. 530, 552–53, 233 A.3d 1197, cert. denied, 335 Conn. 961, 239 A.3d 1214 (2020).

We agree with the defendant that the prosecutor improperly commented on facts not in evidence when he suggested that the victim's mother knew, in 2016, that the defendant had been referring to himself as Zeus. "We long have held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case. . . . *State* v. *Stevenson*, 269 Conn. 563, 587, 849 A.2d 626 (2004)." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, 103 Conn. App. 406, 424–25, 931 A.2d 298, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007). In the present case, the prosecutor's statement was not grounded on any evidence in the record. Moreover, not only did the statement "wholly [invent] facts"; (internal quotation marks omitted) *State* v. *Harris*, supra, 198 Conn. App. 552; but it also offered corroboration for the victim's testimony that the defendant had used the nickname Zeus. Accordingly, we conclude that the prosecutor improperly commented on facts not in evidence. See *State* v. *Santiago*, supra, 424–25.

Although we agree with the defendant that the prosecutor improperly commented on facts not in evidence, the defendant "is not entitled to a new trial on this ground unless the prosecutor's impropriety caused him to suffer substantial prejudice." *State* v. *Batista*, 101 Conn. App. 623, 637, 922 A.2d 1116, cert. denied, 284 Conn. 918, 933 A.2d 721 (2007). Following our review of the relevant factors as applied to the circumstances

of this case, we are not persuaded that the defendant's due process rights were violated.

In order to demonstrate substantial prejudice, the defendant "must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence of] the sum total of the improprieties. . . .

"To aid us in determining whether prosecutorial impropriety so infected the proceedings with unfairness as to deprive a defendant of a fair trial, this court applies the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540]. These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 563–64.

Applying these factors to the present case, we conclude that the prosecutor's one, isolated improper statement did not deprive the defendant of a fair trial. The impropriety, which was not invited by defense conduct or argument, was not severe when considered in the context of the entire trial. Notably, the impropriety "was [not] perceived by defense counsel as being so severe as to warrant an objection. See, e.g., *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019)

(defense counsel's failure to object to allegedly improper comments is 'a strong indication that they did not carry substantial weight in the course of the trial as a whole and were not so egregious that they caused the defendant harm') . . . ." (Citation omitted.) *State* v. *Hinds*, supra, 344 Conn. 564. Moreover, the impropriety was neither egregious nor inexcusable. See *State* v. *Sullivan*, supra, 351 Conn. 823 (when defense counsel does not object, request curative instructions or ask for mistrial, "only instances of grossly egregious [prosecutorial impropriety] will be severe enough to mandate reversal" (internal quotation marks omitted)); *State* v. *Sinclair*, 173 Conn. App. 1, 23, 162 A.3d 43 (2017) ("[b]eyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable" (internal quotation marks omitted)), aff'd, 332 Conn. 204, 210 A.3d 509 (2019). It is also significant that the impropriety was isolated and made only once.

Given the lack of eyewitnesses and physical evidence, the central issue in this case concerned the credibility of the victim's testimony about the sexual abuse. Although the defendant contends that the impropriety was central to boosting the victim's credibility, we are not convinced. At best, to the extent that the prosecutor's statement provided support for the victim's testimony about the nickname, the impropriety was tangentially related to the central issue. We reach this determination giving due consideration to the fact that the victim's testimony that the defendant referred to himself as Zeus was but one aspect of her extensive and detailed testimony regarding the defendant's alleged sexual abuse, which spanned more than three days of trial. After the victim's initial testimony about the nickname, the reference to Zeus did not arise during the trial until the state introduced the Snapchat message and video sent by the defendant to the victim in December, 2017. Although

the message said it was from Zeus and the defendant disputes that he sent the message, it was accompanied by a video, which the jurors were able to view and determine for themselves whether the defendant was the person in the video and, thus, the sender who identified himself as Zeus. We do not perceive the prosecutor's isolated misstatement about the victim's mother's knowledge of the nickname Zeus as affecting the jury's consideration of that evidence. Thus, the defendant's claim to the contrary notwithstanding, our review of the transcript of the entire trial demonstrates that the testimony about the defendant's nickname was not central to the state's case or to the elements of any of the crimes of which he was convicted. Moreover, even if we were to conclude that it was central to a critical issue in the case, when viewed in the context of the entire trial, the impact of the prosecutor's improper comment was minimal. See *State* v. *Courtney G.*, supra, 339 Conn. 365.

Although no curative measures were taken by the trial court, "the absence of such measures is attributable to [defense counsel's] failure to object or request any curative instruction from the court." (Internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 564; see also *State* v. *Sullivan*, supra, 351 Conn. 824 ("the defendant bears much of the responsibility for the fact that [the] claimed improprieties went uncured because defense counsel did not object to the prosecutor's statements at trial" (internal quotation marks omitted)). The court, however, in its instructions to the jurors, stated that they were "the sole judges of the facts" and of the credibility of the witnesses, that they had to determine the facts on the basis of the testimony and exhibits that had been received into evidence, and that arguments and statements of counsel are not evidence, and our Supreme Court has found similar instructions to be "more than adequate to counteract any harm resulting

from . . . alleged improprieties." *State* v. *Hinds*, supra, 564; see also *State* v. *Kenneth K.*, 232 Conn. App. 657, 667, A.3d (2025) (" '[b]arring contrary evidence, we must presume that juries follow the instructions given them by the trial judge' "). In addition, the prosecutor, in his closing remarks, reminded the jurors multiple times that his arguments were not evidence and that the jurors should rely on their memories.

Finally, with respect to the strength of the state's case, although "a sexual assault case lacking physical evidence" can be regarded as "not particularly strong"; *State* v. *Ritrovato*, 280 Conn. 36, 57, 905 A.2d 1079 (2006); we must be mindful that "[t]he sexual abuse of children is a crime [that], by its very nature, occurs under a cloak of secrecy and darkness. It is not surprising, therefore, for there to be a lack of corroborating physical evidence . . . . Given the rarity of physical evidence in [sexual assault cases involving children], a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse . . . . [Our Supreme Court has] never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 365–66.

In the present case, despite the lack of physical evidence, the jury had before it other evidence in addition to the testimony of the victim. The victim's mother testified regarding changes in the victim that corresponded with the defendant's birthday party in New York, as well as about a warning she had given to Brenda A. regarding the defendant and the victim, which was corroborated by King's testimony about the warning. The state also presented expert testimony from Melillo about common behaviors of children who have been

sexually abused, including how it is "extremely difficult for a child to report sexual abuse," and that when the child's abuser is a relative, the child can have both a respectful relationship and a hateful relationship with the abuser in that the child can still have a sense of loyalty to his or her abuser, yet also, at times, be fearful of the abuser, which was consistent with the victim's behaviors during the time of the sexual abuse. Additionally, the state introduced a photocopy of the defendant's driver's license taken by Scillia at the hospital, as well as Scillia's testimony that the person who gave him the license, the defendant, wanted to discuss a crime of which he thought he might be accused, and the Snapchat message from Zeus and the video of the sender were admitted into evidence for the jury to review. The jury also had before it a transcript of the victim's forensic interview and Concepcion's report summarizing that interview, as well as Murphy's report of her examination, all of which included the victim's accounts of the sexual abuse by her cousin, the defendant. Thus, although the evidence presented by the state in the present case was not overwhelming, we conclude "that the state's case was 'not so weak as to be overshadowed' by" a single improper comment made by the prosecutor. *State* v. *Courtney G.*, supra, 339 Conn. 366; see also *State* v. *Sullivan*, supra, 351 Conn. 825; *State* v. *Gary S.*, supra, 345 Conn. 420; *State* v. *Carlos E.*, 158 Conn. App. 646, 669, 120 A.3d 1239, cert. denied, 319 Conn. 909, 125 A.3d 199 (2015).

Accordingly, we conclude that the occurrence of this single, isolated impropriety, coupled with the failure of defense counsel to object to the impropriety or to request curative instructions or a mistrial, did not substantially prejudice the defendant or deprive him of a fair trial. See *State* v. *Sullivan*, supra, 351 Conn. 825–26.

The judgment is affirmed.

In this opinion the other judges concurred.